UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEC 1 0 2004

DAVID CHU,

               Plaintiff,

   v.

VF CORPORATION,

              Defendant.

Case No.:

<u>COMPLAINT</u>



04 CIV. 9727
JUDGE KAPLAN

Plaintiff David Chu, by his undersigned counsel, as and for his Complaint for a declaratory judgment in this action, alleges, with knowledge as to himself and his own acts, and otherwise upon information and belief, as follows:

<u>PRELIMINARY STATEMENT</u>

1.     This is an action for declaratory judgment, pursuant to 28 U.S.C. § 2201, to set forth certain of the rights and obligations of the parties pursuant to a written Employment and Consulting Agreement dated July 7, 2003 entered into by and among the parties to this action, and specifically, a restrictive covenant not to compete contained therein (the "Employment Agreement," a copy of which is annexed hereto as Exhibit A). Simply put, defendants, after terminating Mr. Chu without cause on or about August 20, 2004, now seek to impermissibly enforce this non-compete provision (which is in any event unenforceable) in violation of the laws of the State of New York.

<u>PARTIES</u>

2.     Plaintiff David Chu is an individual residing in New York, New York.

3.      Defendant VF Corporation (hereinafter "VF") is a corporation organized and existing pursuant to the laws of the State of Pennsylvania and having its principal place of business in Greensboro, North Carolina.

## JURISDICTION

4.      Jurisdiction is proper in this Court under 28 U.S.C. 1332.

5.      Personal jurisdiction over the defendant is proper in this Court pursuant to CPLR 302(a)(1) and (4), and based upon the parties' written agreements.

## VENUE

6.      Venue is proper in this District pursuant to 28 U.S.C. 1391. Defendant routinely transacts business in this District and is subject to personal jurisdiction in this District. Defendant has also consented to the jurisdiction and venue of this Court in the written agreement at issue.

## RELEVANT FACTS

7.      David Chu is the founder, creator and designer of the highly successful retail business, Nautica Enterprises, Inc., and the original owner of the Nautica mark.  On or about July 7, 2003, Mr. Chu entered into an agreement with VF whereby VF's wholly-owned subsidiary, Voyager Acquisition Corporation, and Nautica, merged into one corporate entity, and the resulting corporation became a wholly-owned subsidiary of VF (the "Merger Agreement").  Also on or about July 7, 2003, Mr. Chu and VF entered into a separate agreement pursuant to which VF acquired the Nautica mark from Mr. Chu (the "Purchase Agreement").

8.      Neither the Merger Agreement nor the Purchase Agreement is affected or implicated by the Employment Agreement or the action herein; both are noted merely as historical background to the relevant facts set forth below.

9.      The term of the Employment Agreement was for two-years, expiring on December 31, 2005, after which a second prong of the agreement—a consulting arrangement—would be triggered.  That consulting arrangement would have been due to expire on December 31, 2008.

10.     Pursuant to the express terms of the Employment Agreement, Mr. Chu served as Chief Executive Officer of a VF "division," which specifically dealt with the Nautica line that he had created.

11.     However, beginning in early 2004, and following a change of the internal corporate structure at VF, VF essentially began a campaign to force Mr. Chu out—a campaign that included decreasing his job responsibilities, shutting him out of meetings, changing his title and preventing him from performing his job functions, so much so that this "new" position was essentially unrecognizable in relation to what the parties had previously agreed.

12.     Then, on August 20, 2004, VF terminated Mr. Chu without cause. (See Letter dated August 20, 2004, from Eric C. Wiseman to David Chu, a copy of which is annexed hereto as Exhibit B.)   That the termination was "without cause" was further confirmed by e-mail from Mr. Chu's counsel to VF on August 23, 2004.  (See e-mail dated August 23, 2004, from J. Mark Lane, Esq. to Lisa Whitney, Esq., a copy of which is annexed hereto as Exhibit C.)

13.     Pursuant to VF's actions, as noted above, Mr. Chu's last day of employment under the Employment Agreement was August 27, 2004.  In the interim, VF also issued a press release announcing Mr. Chu's termination on or about August 20, 2004.  (See VF Press Release, dated August 20, 2004, a copy of which is annexed hereto as Exhibit D.)

14.     Pursuant to the terms of the Employment Agreement, Mr. Chu had the option of receiving additional payments following his termination, provided that he (a) sign a release of all claims against VF and (b) agree to abide by the Employment Agreement's non-compete provision going forward.  Mr. Chu rejected these options. (See Employment Agreement, Exhibit A hereto, at Section 9(a).)  In fact, VF actually attempted to tender payment directly into Mr. Chu's account, which he refused to accept and in fact returned.  (See Letter dated September 14, 2004, from Wai G. Eng, CPA to Nautica, annexed hereto as Exhibit E.)

15.     Thereafter, and consistent with Mr. Chu's rights and obligations under the Employment Agreement, Mr. Chu issued his own press release on November 8, 2004, announcing his new retail venture targeting the luxury retail market (a market in which Nautica does not compete).  The press release was picked up the media, and reports were issued by industry publications, including in the leading magazine Women's Wear Daily.  (See WWD article dated November 8, 2004, the text of which is annexed hereto as Exhibit F.)  Thereafter, and notwithstanding the fact that Mr. Chu was terminated by VF without cause, and had declined the post-termination benefits that would be triggered a continuing restrictive covenant, VF, by its Assistant General Counsel, Laura C. Meagher, Esq., wrote to Mr. Chu to (falsely) inform him that "you are

subject to a non-compete agreement with Nautica and VF Corporation." (See Letter dated November 10, 2004, from Laura C. Meagher, Esq. to David Chu, a copy of which is annexed hereto as Exhibit G.) It is therefore VF's position that the non-compete provision of the Employment Agreement is in full force and effect, a position which Mr. Chu disputes.

16.     VF's breach of its obligations to Mr. Chu prior to his actual termination (including effectively preventing him from doing his job), and VF's termination of Mr. Chu without cause, together with Mr. Chu's refusal to accept any continuing benefits as offered by VF, individually and collectively render the non-compete provision in the Employment Agreement unenforceable as a matter of law, and as a matter of contract.  Additionally, the non-compete provision is itself excessively broad and unreasonable with regard to both geographic limitation and scope, particularly since Mr. Chu's new retail venture does not compete in any way with VF's brands, and because VF's attempt to enforce this provision would render Mr. Chu unable to pursue his livelihood.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

17.     Plaintiff repeats and incorporates herein the allegations set forth in paragraphs 1 through 16 above.

18.     Plaintiff David Chu seeks a declaration by the Court that the non-compete provision of the Employment Agreement is unenforceable as a matter of law because:

(a)     VF terminated Mr. Chu without cause;

(b)     Mr. Chu declined further payments from VF pursuant to Section 9(a) of the Employment Agreement;

(c)     The non-compete provision is overly broad with respect to geographic limitation and scope, particularly since Mr. Chu's new venture does not compete with any VF brand, and because such enforcement would render Mr. Chu unable to pursue his livelihood.

19.     Plaintiff has no adequate remedy at law.

**WHEREFORE**, plaintiff respectfully requests a declaration setting forth the rights and obligations of the parties with respect to the non-compete provision of the Employment Agreement, and specifically that such provision is not enforceable by defendant, and for such other and further relief as to the Court may seem just or proper.

Dated:   December 9, 2004

KOO LARRABEE LAU-KEE & LANE, LLP

By: _____
     J. Mark Lane (JL 0595)
     Sharon M. Sash (SS 7204)
     106 Corporate Park Drive, Suite 110
     White Plains, New York 10022-7519
     (914) 251-0001 (phone)
     (914) 251-0969 (fax)
     Attorneys for Plaintiff David Chu

A

EXECUTION COPY

# EMPLOYMENT AND CONSULTING AGREEMENT

This Employment and Consulting Agreement (the "Agreement") dated as of July 7, 2003 is entered into by and among David Chu (the "Executive"), Voyager Acquisition Corporation, a Delaware corporation (the "Company") and wholly-owned subsidiary of VF Corporation, a Pennsylvania corporation (the "Parent"), and Parent, as guarantor and third party beneficiary.

WHEREAS, concurrently with the execution and delivery of this Agreement, Nautica Enterprises, Inc., a Delaware corporation ("Nautica"), the Parent and the Company are entering into an Agreement and Plan of Merger (the "Merger Agreement") pursuant to which the Company will be merged with and into Nautica (the "Merger") and the surviving corporation will become a wholly-owned subsidiary of the Parent, with references to the "Company" following the Merger being understood as referring to the surviving corporation; and the Parent, the Executive and an affiliate of the Executive are entering into a Purchase Agreement (the "Purchase Agreement") pursuant to which the Parent will acquire certain intellectual property from such affiliate of the Executive (the "Purchase"); and

WHEREAS, upon consummation of the Merger, the Company desires to secure (i) the continued services and employment of the Executive on behalf of the Division (as hereafter defined) for a term of two years or until the Executive's employment shall be terminated in accordance with this Agreement and (ii) at the Company's request, after the Executive's employment is terminated in accordance with the terms of this Agreement, the continued advisory and consulting services of the Executive for a maximum term of three years.

NOW, THEREFORE, in consideration of the promises and mutual covenants contained herein, the parties hereto agree as follows:

Section 1. *Definitions.*

(a)    "Base Salary" shall mean the annual rate of salary provided for in Section 5 of this Agreement.

(b)    "Cause" shall mean (i) any act or omission which constitutes a material breach by the Executive of this Agreement; (ii) a conviction or plea of guilty or *nolo contendere* to a felony (or indictable offense) or a misdemeanor (or summary conviction offense) involving moral turpitude; (iii) the Executive's grossly negligent or willful violation of corporate policy or reasonable and appropriate directions from senior management of the Parent; or (iv) a material breach of the Executive's fiduciary duties.

(c)    "Change in Control" shall mean:

EXECUTION COPY

(i)      a change in control of the Parent of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A, as in effect on the date hereof, promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"); *provided*, that, without limitation, such a change in control shall be deemed to have occurred if:

(A)      any "Person" (as such term is used in §13(d) and §14(d) of the Exchange Act), except for (1) those certain trustees under Deeds of Trust dated August 21, 1951 and under the Will of John E. Barbey, deceased (a "Trust" or the "Trusts"), and (2) any employee benefit plan of the Parent or any subsidiary company of the Parent, or any entity holding voting securities of the Parent for or pursuant to the terms of any such plan (a "Benefit Plan" or the "Benefit Plans"), is or becomes the "beneficial owner" (within the meaning of Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Parent representing 20% or more of the combined voting power of the Parent's then outstanding securities;

(B)      there occurs a contested proxy solicitation of the Parent's shareholders that results in the contesting party obtaining the ability to vote securities representing 30% or more of the combined voting power of the Parent's then outstanding securities; or

(C)      there occurs a sale, exchange, transfer or other disposition of substantially all of the assets of the Parent to another entity, except to an entity controlled directly or indirectly by the Parent, or a merger, consolidation or other reorganization of the Parent in which the Parent is not the surviving entity, or a plan of liquidation or dissolution of the Parent other than pursuant to bankruptcy or insolvency laws is adopted; or

(ii)      a sale by the Parent of substantially all of the assets of Nautica.

Notwithstanding Clause (c)(i)(A) above to the contrary, a change in control shall not be deemed to have occurred if a Person becomes the beneficial owner, directly or indirectly, of securities of the Parent representing 20% or more of the combined voting power of the Parent's then outstanding securities solely as the result of an acquisition by the Parent or any subsidiary company of the Parent of voting securities of the Parent which, by reducing the number of shares outstanding, increases the proportionate number of shares beneficially owned by such Person to 20% or more of the combined voting power of the Parent's then

(NY) 21528/029/BRNXU/dc.bmp.sgt.1.doc                    2

outstanding securities; *provided, however,* that if a Person becomes the beneficial owner of 20% or more of the combined voting power of the Parent's then outstanding securities by reason of share purchases by the Parent or any subsidiary company of the Parent and shall, after such share purchases by the Parent or a subsidiary company of the Parent, become the beneficial owner, directly or indirectly, of any additional voting securities of the Parent, then a change in control of the Parent shall be deemed to have occurred with respect to such Person under Clause (o)(i)(A) above. Notwithstanding the foregoing, in no event shall a change in control of the Parent be deemed to occur under Clause (c)(i)(A) above with respect to the Trusts or Benefit Plans. Clauses (c)(i)(A) and (c)(i)(B) to the contrary notwithstanding, the Board may, by resolution adopted by at least two-thirds of the directors who were in office at the date a change in control occurred, declare that a change in control described in Clauses (c)(i)(A) or (c)(i)(B) has become ineffective for purposes of this Agreement if all of the following conditions then exist: (1) the declaration is made prior to the death, disability or termination of employment of the Executive and within 120 days of the change in control; and (2) no Person, except for (x) the Trusts, and (y) the Benefit Plans, either is the beneficial owner, directly or indirectly, of securities of the Parent representing 10% or more of the combined voting power of the Parent's outstanding securities or has the ability or power to vote securities representing 10% or more of the combined voting power of the Parent's then outstanding securities. If such a declaration shall be properly made, no benefits shall be payable hereunder as a result of such prior but now ineffective change in control, but benefits shall remain payable and this Agreement shall remain enforceable as a result of any other change in control unless it is similarly declared to be ineffective.

(d)  "**Common Stock**" shall mean the common stock of the Parent.

(e)  "**Conceptions and Developments**" shall have the meaning set forth in Section 12 of this Agreement.

(f)  "**Confidential Information**" shall have the meaning set forth in Section 11 of this Agreement.

(g)  "**Consulting Services**" shall have the meaning set forth in Section 10 of this Agreement.

(h)  "**Consulting Term**" shall have the meaning set forth in Section 10 of this Agreement.

(i)  "**Covered Conceptions and Developments**" shall have the meaning set forth in Section 12 of this Agreement.

(NY) 21328/029/BEN03/dc.emp.agt.1.doc                    3

EXECUTION COPY

(j)    "Disability" shall mean a disability entitling the Executive to receive disability benefits under the Company's group long-term disability insurance policy as in effect from time to time.

(k)    "Division" shall mean the Nautica branded wholesale business, whether or not organized and operated by the Company as a separate business unit and without regard to the corporate entity or entities that operates such business.

(l)    "Effective Date" shall have the meaning set forth in Section 2 of this Agreement.

(m)    "Employment Term" shall have the meaning set forth in Section 3 of this Agreement.

(n)    "Fair Market Value" shall mean the average of the reported high and low sales price of the Common Stock (rounded up to the nearest one-tenth of a dollar) on the date on which the Fair Market Value is to be determined (or if there was no reported sale on such date, the next preceding date on which any reported sale occurred) on the principal exchange or in such other principal market on which the Common Stock is trading.

(o)    "Good Reason" shall mean the occurrence of any of the following events without the Executive's written consent:

(i)    a reduction in the Executive's Base Salary or Target Bonus opportunity as a percentage of Base Salary; or

(ii)    a material diminution in the Executive's duties, a change in the Executive's title or the assignment to the Executive of duties which are materially inconsistent with his duties as contemplated by Section 4 of this Agreement; or

(iii)    the relocation of Executive's principal work location outside Manhattan, New York; or

(iv)    any material breach by the Company of its obligations under this agreement which is not cured within 30 business days after written notice thereof is delivered by Executive to the Company; or

(v)    the sale or other disposition of the Division.

(p)    "Group" shall have the meaning set forth in Section 11 of this Agreement.

4

(q)   "**Initial Option**" shall have the meaning set forth in Section 7 of this Agreement.

(r)   "**Intellectual Property Rights**" shall have the meaning set forth in Section 12 of this Agreement.

(s)   "**IP Period**" shall have the meaning set forth in Section 12 of this Agreement.

(t)   "**Target Bonus**" shall have the definition set forth in Section 6 of this Agreement.

(u)   "**Transition Agreement**" shall mean the Transition Agreement dated July 11, 1991 between Nautica (formerly State-O-Maine, Inc.) and the Executive.

Section 2.  *Effective Date.*  This Agreement shall become effective upon the "Effective Time" of the Merger pursuant to the Merger Agreement and the closing of the Purchase pursuant to the Purchase Agreement (the "**Effective Date**").  If either the Merger Agreement or the Purchase Agreement is terminated, in each case for any reason, then this Agreement shall become null and void and, notwithstanding any provisions to the contrary set forth herein, including provisions that purport to survive termination, this Agreement shall not survive any termination pursuant to this sentence and neither party shall have any obligation to the other hereunder.

Section 3.  *Term of Employment Services.*  The term of the Executive's employment hereunder shall commence on the Effective Date and shall continue until December 31, 2005, unless the Executive's employment is terminated before in accordance with the terms of this Agreement (such term, the "**Employment Term**").

Section 4.  *Employment Term Position, Duties and Responsibilities.*  During the Employment Term, the Executive shall serve as the Chief Executive Officer of the Division.  During the Employment Term, the Executive shall devote such time and attention to the business and affairs of the Company and the Division as shall be necessary to discharge his responsibilities hereunder and shall use his best efforts, skills and abilities to promote the Company's and the Division's interests.  During the Employment Term, the Company shall provide the Executive with office space within the space utilized by the Division's design operations and with an executive office within the space utilized by the Company's executive offices, each of which shall be substantially comparable to the Executive's offices prior to the Effective Date.

[NY] 21328/029/BEN03/dc.4mp.agr.1.doc

5

EXECUTION COPY

Section 5. *Base Salary.* During the Employment Term, subject to the Executive's continued employment hereunder, the Executive shall be paid an annualized Base Salary of $625,000, payable in accordance with the regular payroll practices of the Company.

Section 6. *Annual Incentive Award.* (a) During the Employment Term, subject to the Executive's continued employment hereunder, the Executive shall have a target bonus opportunity each year equal to 100% of his Base Salary (the "Target Bonus"), payable in that amount if the target performance goals for such year are achieved. If the target performance goals are not achieved, the Executive shall receive a lesser amount in proportion to the performance level achieved, *provided, however,* that the Executive shall only be entitled to such lesser amount if at least 80% of target performance is achieved. If such performance goals are exceeded, the Executive shall receive a greater amount in proportion to the level achieved, up to a maximum of 150% of the Target Bonus. The Company shall establish the performance goals for the relevant calendar year prior to the beginning of such year in consultation with the Executive. Except as otherwise provided herein, the Executive shall be paid his annual incentive awards under this Section 6 no later than other senior executives of the Parent are paid their annual incentive awards, but in no case later than 90 calendar days following the end of the performance period to which any such award relates.

(b) Notwithstanding the foregoing, the Executive's annual incentive awards for the following periods shall be as described below:

(i) In the event that the Effective Date occurs prior to January 1, 2004, for calendar year 2003, the Executive shall be entitled to an annual incentive award equal to his fiscal year 2004 annual incentive award under Nautica's incentive award plan, multiplied by a fraction the numerator of which is 5 and the denominator of which is 6.

(ii) In the event that the Effective Date occurs on or after January 1, 2004, for calendar year 2004, the Executive shall be entitled to an annual incentive award equal to (A) the annual incentive award for the Company's fiscal year 2004 determined in accordance with Paragraph 6(a) above, multiplied by a fraction the numerator of which is the number of days that the Executive was employed by the Company during the period that begins on the Effective Date and ends on December 31, 2004 and the denominator of which is 365, plus (B) the Executive's annual incentive award under Nautica's incentive award plan for fiscal year 2004 multiplied by a fraction the numerator of which is the number of days during the period that begins on March 1, 2003 and ends on the day immediately preceding the Effective Date and the denominator of which is 365.

Section 7. *Long-term Incentive Awards.* (a) *Initial Option Grant.* On the Effective Date, the Company shall grant to the Executive an option to purchase 100,000 shares of Common Stock at the Fair Market Value of the Common Stock on the date of grant (an "**Initial Option**"). The Initial Option shall vest in thirds on each of the first, second and third anniversaries of the date of grant and shall have an eight-year term; *provided, however,* that (i) if during the Employment Term the Executive's employment is terminated by the Company for Cause or by the Executive voluntarily without Good Reason, the Initial Option shall be immediately forfeited in full and shall automatically expire upon such termination of employment; (ii) if during the Employment Term the Executive's employment terminates by reason of the death of the Executive or if the Employment Term expires in accordance with Section 3 hereof, the Initial Option shall continue to vest and remain outstanding and exercisable until the third anniversary of such termination or expiration, at which time it shall automatically expire; (iii) if during the Employment Term the Executive's employment terminates by reason of the disability of the Executive, the Initial Option shall continue to vest and remain outstanding and exercisable until the first anniversary of such termination, at which time it shall automatically expire; (iv) if during the Employment Term the Executive's employment is terminated by the Company without Cause or by the Executive for Good Reason, the provisions of Section 9(a) hereof shall apply; and (v) the Initial Option shall vest in full upon the occurrence of a Change in Control. Except as otherwise provided in this Agreement, the Initial Option shall be made on terms and conditions consistent with options granted to other senior executives of the Parent under the Parent's incentive plan.

(b)    *Ongoing Performance Awards.* During the Employment Term, subject to the Executive's continued employment hereunder, the Executive shall be entitled to participate in any annual equity award program for senior executives of the Parent as may be in effect from time to time, in accordance with the terms of any such program, on the same basis as other senior executives of the Parent.

Section 8. *Employee Benefit Programs.* (a) During the Employment Term, the Executive shall be entitled to participate in all employee pension and welfare benefit plans and programs of the type made available to the senior executives of the Parent's principal business units and to the Company's employees generally, as such plans or programs may be in effect from time to time, including, without limitation, pension, profit sharing, savings and other retirement plans or programs, 401(k), medical, dental, hospitalization, short-term and long-term disability and life insurance plans, accidental death and dismemberment protection, travel accident insurance, and any other pension or retirement plans or programs and any other employee welfare benefit plans or programs that may be sponsored by the Company from time to time, including any plans that supplement the above-listed types of plans or programs, whether funded or unfunded.

EXECUTION COPY

(b) During the Employment Term, the Executive shall be entitled to reimbursement for reasonable business and travel expenses incurred by him, subject to the Company's or the Parent's expense reimbursement policy, whichever is more favorable, as in effect from time to time; *provided*, the Executive shall be entitled to first-class air travel in connection with up to eight international voyages per year. During the Employment Term, the Company shall provide the Executive with (i) one executive assistant selected by the Executive, *provided, that* at the Executive's election and expense, the Company shall provide the Executive with a second executive assistant selected by the Executive and (ii) reimbursement for the lease, insurance, maintenance, housing and repair of the car provided to the Executive prior to the Effective Date.

Section 9. *Termination of Employment.* (a) *Termination without Cause or for Good Reason.* Subject to the Executive's continued compliance with Section 13 of this Agreement, and provided that the Executive signs a release of all claims in connection with his employment with the Company and the termination thereof in a form satisfactory to the Company and the Executive (but not releasing any claims relating to the Purchase Agreement or any rights in the nature of indemnification or contribution, whether under the Merger Agreement, the certificate of incorporation of the Company or otherwise), if, in all cases prior to December 31, 2005, the Executive's employment is terminated by the Company without Cause or if the Executive terminates his employment for Good Reason, or if the Executive's employment is terminated by the Company within two years after a Change in Control (other than for Cause), the Executive shall be entitled to:

(i) Base Salary which would otherwise be due to him through December 31, 2005, payable in accordance with the regular payroll practices of the Company;

(ii) an annual incentive award for each remaining year in the period ending on December 31, 2005 (including the year in which such termination of employment occurred) equal to the Target Bonus, payable in accordance with Section 6 of this Agreement;

(iii) immediate vesting as to 100% of the shares underlying the Initial Option, which shall remain exercisable for a period of 180 days;

(iv) solely if the Executive's employment is terminated by the Company without Cause or if the Executive terminates his employment for Good Reason, in either case within two years after a Change in Control, immediate vesting as to 100% of the shares underlying any other option granted to the Executive pursuant to a plan of the Parent, which shall remain exercisable for a period of 180 days;

(NY) 21328/029/BEN03/dc.emp.agt.1.doc

8

EXECUTION COPY

    (v)    the balance of any additional incentive awards earned for performance periods which have been completed, but which have not yet been paid;

    (vi)    any expense reimbursements due to the Executive; and

    (vii)    other benefits, if any, in accordance with applicable plans and programs of the Company.

    (b)    *Other Termination.* If the Executive's employment with the Company is terminated prior to December 31, 2005 for any reason other than by the Company without Cause or by Executive for Good Reason, the Executive or his estate or beneficiaries shall be entitled to:

    (i)    Base Salary which would otherwise be due to the Executive through the date on which such termination of employment occurs;

    (ii)    the balance of any incentive awards earned for performance periods which have been completed, but which have not yet been paid;

    (iii)    any expense reimbursements due to the Executive; and

    (iv)    other benefits, if any, in accordance with applicable plans and programs of the Company.

    (c)    *No Mitigation; No Offset.* In the event of any termination of employment under this Section 9, the Executive shall be under no obligation to seek other employment and there shall be no offset against amounts due to the Executive under this Agreement on account of any remuneration attributable to any subsequent employment that he may obtain.

    Section 10. *Consulting Services.* (a) Provided that the Executive is continuously employed by the Company during the Employment Term, the Executive shall provide advisory and consulting services ("**Consulting Services**") to the Company in accordance with this Section 10 during the period from January 1, 2006 until the earlier of December 31, 2008 or the date on which the Company notifies the Executive that it no longer wishes to receive Consulting Services (the "**Consulting Term**"). The Executive shall, during the Consulting Term, render such Consulting Services to the Company and the Division as may be reasonably requested by the Company; *provided, that* Executive shall not be required to devote more than 60 hours per month to the provision of such services. Such Consulting Services shall be related to such matters relating to the Division as the Company may designate from time to time.

    (b)    During the Consulting Term, subject to the Executive's continued compliance with Section 13 of this Agreement, the Executive shall be paid an

6-10-2004 10:20AM FROM WAHO ENG CPA PO 212 692 9191 Case 1:04-cv-09727-LAK Document 1 Filed 12/10/04 Page 17 of 39 P. 11

SEP.19.2003 8:24AM VF WORLD HDQRS 336 424 7696 NO.220 P.11/19

EXECUTION COPY

annualized consulting fee of $500,000, payable monthly in arrears commencing on the last day of the first month of the Consulting Term and on the last day of each month thereafter during the Consulting Term.

(c)     During the Consulting Term, the Company shall reimburse the Executive for reasonable business-related expenses incurred by him in connection with the performance of the Consulting Services, subject to the Company's policies relating to business-related expenses as in effect from time to time and the submission of an adequately documented expense report, as the Company may require.

Section 11. *Confidential Information.* The Executive acknowledges that, in the course of his employment, he has had and will have access to and has become and will become aware of and informed of confidential and/or proprietary information that is a competitive asset of the Parent, the Company, their subsidiaries and affiliates (the "Group"), including, without limitation the terms of agreements or arrangements between any members of the Group and any third parties, marketing strategies, marketing methods, development ideas and strategies, personnel training and development programs, financial results, strategic plans and demographic analyses, trade secrets, business plans, product designs, statistical data, and any non-public information concerning the Group, its employees, suppliers, resellers, or customers, other than (i) information which is otherwise available in the public domain (other than by reason of the breach by the Executive of this Agreement) and (ii) generic information of the type that would generally be known by individuals of the Executive's level of experience in the apparel industry that does not pertain in a unique way to the Group (collectively, "**Confidential Information**"). The Executive will keep all Confidential Information in strict confidence while employed by the Company and thereafter and will not directly or indirectly make known, divulge, reveal, furnish, make available or use any Confidential Information (except in good faith in the course of his regular authorized duties on behalf of the Company or the Division and for the benefit of the Company or the Division). The Executive's obligations of confidentiality hereunder will survive the termination of this Agreement, until and unless any such Confidential Information becomes, through no fault of the Executive, generally known to the public or the Executive is required by law to make disclosure (after giving the Company notice and an opportunity to contest such requirement). The Executive's obligations under this Section 11 are in addition to, and not in limitation or preemption of, all other obligations of confidentiality which the Executive may have to the Company under general legal or equitable principles.

Section 12. *Employee Conceptions and Developments.* The Company shall own all Intellectual Property Rights in and to, and, for the duration of such Intellectual Property Rights have the exclusive rights of commercial exploitation with respect to, all Conceptions and Developments made individually or jointly

EXECUTION COPY

by Executive while Executive is employed by the Company (the "IP Period"). Any application made within six months after the IP Period to register or protect Intellectual Property Rights in any Conceptions and Developments as to which Executive was an inventor, author or assignor shall be presumed to have been originally made during the IP Period and subject to the Company's ownership pursuant to the foregoing sentence. For purposes hereof, the term "Conceptions and Developments" means all creative, expressive, branding or technological conceptions, discoveries and developments of any nature, including without limitation conceptions for products and processes, inventions, designs, writings, graphics, animations and other works or authorship, specifications, drawings, methods, formulas and branding proposals, and any implementations, improvements, derivative works or modifications thereof relating to the business of the Company, and the term "Intellectual Property Rights" means all U.S. and foreign patents, copyrights, trademarks, trade secret, publicity and similar rights (including without limitation any and all common law rights), and all rights of priority under international conventions to make application with respect thereto. All Conceptions and Developments arising during the IP Period by virtue of either of the first two sentences of this Section 12 are referred to as the "Covered Conceptions and Developments". Executive shall be obligated to assign to the Company all inventions included in the Covered Conceptions and Developments. All works of authorship included in the Covered Conceptions and Developments shall be deemed "works made for hire" to the maximum extent they may qualify as such under 17 U.S.C. Section 101, and otherwise the copyright therein shall be deemed to have been fully assigned by Executive to the Company at the time such works were made. All Covered Conceptions and Developments, whether or not patentable, shall be promptly disclosed to the Company in writing, and shall be held in confidence by Executive and treated as "Confidential Information" subject to Section 11 of this Agreement, until such time as the Company, in its sole determination, shall elect to make the subject matter thereof publicly known. Executive agrees that, at the expense of the Company, he will, without additional compensation, take any such further action, including the rendering of all lawful testimony and assistance, and the execution and delivery to such instruments as the Company may reasonably require from time to time, to perfect, effectuate, register, record or enforce the Company's rights or interests in any of the Covered Conceptions and Developments. The Executive hereby irrevocably appoints the Company to be the Executive's attorney-in-fact to act in Executive's name, place and stead to do and execute any such act or instrument for the purpose of this Section 12. The Company shall be under no liability to account to the Executive for any revenue or profit derived or resulting from the use, exploitation or licensing of any of the Covered Conceptions or Developments subject to this Section 12 (other than pursuant to the terms of the Purchase Agreement).

Section 13. *Noncompetition, Noninterference and Nonsolicitation.* (a) Subject to the geographic limitation of Section 13(b) hereof, the Executive (i)

EXECUTION COPY

during the period from the Effective Date through December 31, 2005 shall not, directly or indirectly, on his behalf or on behalf of any other person, firm, corporation, association or other entity, as an employee or otherwise, engage in, or in any way be concerned with or negotiate for, or acquire or maintain any ownership interest in any business or activity which is the same as or competitive with that conducted by the Parent or the Company at the termination of his employment by the Company, or which was engaged in or developed by the Parent or the Company at any time during the Employment Term for specific implementation in the immediate future by the Parent or the Company; and (ii) during the Consulting Term shall not, directly or indirectly, on his behalf or on behalf of any other person, firm, corporation, association or other entity, as an employee or otherwise, engage in, or in any way be concerned with or negotiate for, or acquire or maintain any ownership interest in any business or activity which is the same as or directly competitive with that conducted by the Division at the termination of his employment by the Company, or which was engaged in or developed by the Division at any time during the Employment Term for specific implementation in the immediate future by the Division. Notwithstanding the foregoing, the Executive shall not be construed to be in violation of this Section 13 solely by reason of (i) owning, directly or indirectly, any stock or other securities of a corporation (or comparable interest in any other form of business organization or entity) that has any class of securities registered under Section 12 of the Securities Exchange Act of 1934 if the Executive's interest does not exceed 10% of the outstanding capital stock of such corporation (or comparable interest in such other organization or entity), (ii) owning, directly or indirectly, any stock or other securities of a corporation (or comparable interest in any other form of business organization or entity) that does not have any class of securities registered under Section 12 of the Securities Exchange Act of 1934 if the Executive's interest does not exceed 25% of the outstanding capital stock of such corporation (or comparable interest in such other organization or entity), or (iii) serving as a non-executive director (non-employee and not involved in the management of any such company) on the board of directors of a corporation (or in a similar capacity with respect to any other organization or entity), in each of clauses (i), (ii) and (iii) regardless of whether or not such corporation (or other business organization or entity) has a business that is the same or competitive with any business of the Parent or the Company (including, without limitation, the Division).

(b)    The Executive acknowledges that each of the Parent and the Company is engaged in business throughout the United States and in various foreign countries and that the Parent and the Company each intend to expand the geographic scope of its activities. Accordingly and in view of the nature of his position and responsibilities, the Executive agrees that the provisions of this Section 13 shall be applicable to each state and each foreign country, possession

or territory in which the Parent and/or the Company may be engaged in business during the Employment Term and Consulting Term.

(c) The Executive agrees that during the period from the Effective Date through December 31, 2005 and during the Consulting Term, the Executive will not, directly or indirectly, for himself or on behalf of any third party at any time in any manner, (i) request or cause any of the Parent's or the Company's customers to cancel, terminate, reduce or otherwise adversely modify any existing or continuing business relationship with the Parent and/or the Company; (ii) solicit, entice, persuade, induce, request or otherwise cause any employee, officer or agent of the Parent and/or the Company (other than clerical employees) to refrain from rendering services to the Parent and/or the Company or to terminate his or her relationship, contractual or otherwise, with the Parent and/or the Company; other than through a general advertisement or public solicitation not directed specifically to employees of the Parent or the Company; or (iii) induce or attempt to influence any supplier to cease or refrain from doing business or to decline to do business with the Parent, the Company or any of their subsidiaries.

(d) The Executive acknowledges and recognizes the highly competitive nature of the businesses of the Parent and the Company and agrees that if the Executive breaches any provision of this Section 13, and does not cure such breach within 30 business days after the receipt of written notice from the Company or the Parent, the Executive shall not be entitled to any further payments or benefits pursuant to this Agreement.

Section 14. *Equitable Remedies.* (a) The Executive acknowledges that his compliance with the covenants in Sections 11, 12 and 13 of this Agreement is necessary to protect the good will and other proprietary interests of the Company and that, in the event of any violation by the Executive of the provisions of Sections 11, 12 and 13 of this Agreement, the Company will sustain serious, irreparable and substantial harm to its business, the extent of which will be difficult to determine and impossible to remedy by an action at law for money damages. Accordingly, the Executive agrees that, in the event of such violation or threatened violation by the Executive, the Executive shall not assert in response to any claim for injunctive or other equitable relief the defense that the Company or Parent has an adequate remedy at law for any such violation. The Executive further agrees that, in the event any of the provisions of Sections 11, 12 and 13 of this Agreement are determined by a court of competent jurisdiction to be contrary to any applicable statute, law or rule, or for any reason to be unenforceable as written, such court may modify any of such provisions so as to permit enforcement thereof as thus modified.

(b) Notwithstanding any other provisions of this Agreement, the provisions of Sections 11, 12, and 14 shall survive and remain in effect

EXECUTION COPY

notwithstanding the termination of this Agreement or a breach by the Company or the Executive of any other terms of this Agreement.

Section 15. *Parent Guarantee.* The Parent hereby guarantees the Company's obligations under Sections 5, 6, 7, 8, 9, 10 and 23 of this Agreement.

Section 16. *Third Party Beneficiary.* The Executive hereby agrees and acknowledges that the Parent shall be a third party beneficiary to the agreements made under Sections 11, 12, 13 and 14 of this Agreement and that the Parent shall have the right to enforce such agreements directly to the extent it deems such enforcement necessary or advisable to protect its rights hereunder.

Section 17. *Representations.* (a) The Company and the Parent individually represent and warrant that each is fully authorized and empowered to enter into this Agreement and that the performance of the obligations of each under this Agreement will not violate any agreement between it and any other person, firm or organization. The Executive represents that the performance of his obligations under this Agreement will not violate any agreement between him and any other person, firm or organization that would be violated by the performance of his obligations under this Agreement.

(b)     None of the Executive or any of his immediate family members or affiliates (i) owns, controls or has any interest in any material asset or other property used in connection with the business of Nautica and its subsidiaries (other than assets being transferred pursuant to the Purchase Agreement) or (ii) has any material interest in any business (corporate or otherwise) that is in competition with the business of Nautica and its subsidiaries.

Section 18. *Entire Agreement.* This Agreement contains the entire understanding and agreement between the Company and the Executive concerning the subject matter hereof and supersedes the Transition Agreement and all prior agreements, understandings, discussions, negotiations and undertakings, whether written or oral, between the Company and the Executive with respect thereto. The Executive agrees and acknowledges that the Transition Agreement shall not be in force and effect and the Executive shall have no rights or entitlements to any payments, benefits or protections thereunder.

Section 19. *Amendment or Waiver.* No provision in this Agreement may be amended unless such amendment is agreed to in writing and signed by the Executive and an authorized officer of the Company. No waiver by the Company or by the Executive of any breach by the other party to this Agreement of any condition or provision contained in this Agreement to be performed by such other party shall be deemed a waiver of a similar or dissimilar condition or provision at the same or any prior or subsequent time. Any waiver must be in writing and

EXECUTION COPY

signed by the Executive or an authorized officer of the Company, as the case may be.

Section 20. *Severability.* In the event that any provision or portion of this Agreement shall be determined to be invalid or unenforceable for any reason, in whole or in part, the remaining provisions of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by law so as to achieve the purposes of this Agreement.

Section 21. *Governing Law and Disputes.* (a) This Agreement shall be governed and construed in accordance with the laws of New York without reference to principles of conflict of laws.

(b)   The parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the United States District Court for the Southern District of New York or any New York State court sitting in New York City, so long as one of such courts shall have subject matter jurisdiction over such suit, action or proceeding and irrevocably waive, to the fullest extent permitted by law, any objection that the parties may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 22 shall be deemed effective service of process on such party.

Section 22. *Notices.* All notices and other communications required or permitted hereunder shall be in writing (including facsimile transmission and, if an electronic mail ("e-mail") address is given below, e-mail transmission, so long as receipt of such e-mail is requested and received) and shall be deemed given,

if to the Parent, Company or the Division:

c/o VF Corporation
105 Corporate Center Boulevard
Greensboro, North Carolina 27408
Attention: Candace Cummings
Facsimile No.: (336) 424-7696
E-mail: candace_cummings@vfc.com

with a copy to:

(NY) 21528/029/BEN03/de.emp.agt.1.doc

15

EXECUTION COPY

Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
Attention: George R. Bason, Jr.
Facsimile No.: (212) 450-3800
E-mail: bason@dpw.com

if to the Executive:

Mr. David Chu
610 Park Avenue
New York, New York 10021
Facsimile No.: (212) 517-8638

with a copy to:

Cleary, Gottlieb, Steen & Hamilton
One Liberty Plaza
New York, New York 10006
Attention: Daniel S. Sternberg
Facsimile No.: 212-225-3999
E-mail: dsternberg@cgsh.com

or such other address or facsimile number as such party may hereafter specify for the purpose by notice to the other parties hereto. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

Section 23. *Indemnification/Insurance*. The Company will indemnify the Executive to the fullest extent authorized by law, whether or not the Executive is made a party or witness to, or target of, any action, suit, proceeding, investigation, or governmental review, whether criminal, civil, administrative, or investigative, for any reasonable expenses incurred by the Executive because he is or was a director, officer, or employee of the Company or serves or served for any other entity as a director, officer, or employee at the Parent's or the Company's request; *provided, however,* that the Executive must repay the Company for any fees or costs advanced under this indemnification if the final determination of an arbitrator or a court of competent jurisdiction declares (following appeals, if any), after the expiration of the time within which judicial review (if permitted) of such determination may be perfected, that indemnification by the Company (i) was not permissible under applicable law or (ii) related to acts or omissions involving or

(NY) 21328/029/BEN03/dc.cmp.agt.1.doc

16

EXECUTION COPY

resulting from the Executive's fraudulent or willful misconduct. The Company's indemnification of the Executive shall include all reasonable costs, expenses, fees, fines, penalties (including the reasonable fees and expenses of such legal counsel as the Executive selects) the Executive incurs in connection with the defense of or response to any such matter. The Company will pay all such sums when the Executive incurs them, subject only to repayment if required by law or as provided above (relating to fraudulent or willful misconduct). The Company shall cause the Executive to be covered by directors and officers insurance to the extent and on the same terms as such coverage is made generally available to senior executives of the Company or to senior executives of the principal business units of the Parent.

Section 24. *Headings.* The headings of the sections contained in this Agreement are for convenience only and shall not be deemed to control or affect the meaning or construction of any provision of this Agreement.

Section 25. *Counterparts.* This Agreement may be executed in two or more counterparts.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

DAVID CHU

VOYAGER ACQUISITION
CORPORATION

By:

Name: Candace S. Cummings
Title:  Vice President

VF CORPORATION, as guarantor and
third party beneficiary

By:

Name: Mackey J. McDonald
Title:  Chairman, President & CEO

(NY) 21328/029/BENO1/da.amp.agt.1.doo

B



Eric C. Wiseman
Vice President and Chairman
Outdoor and Sportswear Coalitions

**VF Corporation**
105 Corporate Center Blvd.
Greensboro, NC 27408
voice 336.424.6016
fax 336.424.7634

August 20, 2004

Mr. David Chu
610 Park Avenue
New York, New York 10021

Dear David:

This is to let you know that, as we discussed last Thursday, your employment as Chief Executive Officer of the Nautica branded wholesale business is terminated effective Friday, August 27, 2004.

Regards,

Eric C. Wiseman

ALL-STATE LEGAL®   800-222-0510

C

# J. Mark Lane

**From:**   J. Mark Lane
**Sent:**   Monday, August 23, 2004 1:49 PM
**To:**     'lisa_whitney@vfc.com'
**Subject:** David Chu

Dear Ms. Whitney:

Thank you for sending me a copy of Mr. Wiseman's letter to David Chu regarding his termination.  Because (as you note in your cover memo) the parties are signatories to a contract regarding Mr. Chu's employment, and because that contract contains specific provisions regarding termination, I believe it is important to be completely clear as to the nature of the termination.  Accordingly, I note that the termination is "without cause," and that the parties' respective rights and obligations shall be determined accordingly.

You may feel free to communicate with me regarding any further matters related to Mr. Chu.

Best regards,

J. Mark Lane
Koo Larrabee Lau-Kee & Lane LLP
106 Corporate Park Drive, Suite 110
White Plains, New York 10604
Ph (914) 251-0001, Ext. 104
Fx (914) 251-0969
jmlane@kllklaw.com

D

David Chu

**Eric Wiseman**          **To**
Sent by: Jill Ettinger          cc   (bcc: David Chu/Nautica/VF Corporation)
                          Subject: Nautica Update
08/20/2004 09:33 AM

## Nautica Update and Leadership Transition

Next Friday, August 27th, marks the one-year anniversary of Nautica's merger with VF Corporation. You should all be very proud of the substantial progress we've made this year. Our Company is financially stronger than it's ever been, the Nautica brand has a focussed positioning and a clear strategy for the future, and our business is gaining momentum with consumers. Thanks for everything you've done to contribute to this success. The magnitude and speed of these improvements could not have been accomplished without your dedication and passion for Nautica. Of course, we will continue to face challenges as we implement our Strategic Plan during the next several years, however, I am very confident that we have the right plan and the right team to win in this environment.

To assist us in maintaining our positive momentum, and to provide leadership as we take Nautica to the next level, I am very pleased to announce that Denise Seegal will be joining the team as our President and Chief Executive Officer. She will assume those responsibilities within the next sixty days. Denise has an extensive leadership background in our industry, including her most recent position as President and CEO for Sweetface Fashions. She has also held leadership assignments with Liz Claiborne; CK Men's and Women's; DKNY; and Ralph Lauren Womenswear; all following her initial retail experience with Bloomingdales. Chris Heyn, President of Nautica Sportswear and Nautica Jeans Company; Rich Anders, President of Nautica Retail and Nautica Kids; Jeff Matthews, President of Nautica Furnishings; Peter Simmonds, Acting Executive Director of Nautica Licensing; and Chris Fuentes, Vice-President, Marketing will all report directly to Denise, who will report to directly to me.

David Chu, CEO and Founder of Nautica, has decided to pursue other personal interests, and will be leaving the Company by the end of August. We thank David for his substantial contributions over the past twenty-one years, and we wish him continued success in his future endeavors.

Attached you will find the official press release publicly announcing these changes. I look forward to your continued support and ask that you do everything you can to welcome Denise to our company.



Press Release - DC dc



**FOR IMMEDIATE RELEASE**

Contact: Cindy Knoebel, CFA
VP, Financial & Corporate
Communications
VF Services, Inc.
(212) 841-7141/(336) 424-6189

### VF ANNOUNCES NAUTICA LEADERSHIP TRANSITION
#### Denise Seegal Named New Nautica President & CEO

**New York City, New York - August 20, 2004 – VF Corporation (NYSE: VFC)** today announced that it has named Denise V. Seegal as President and Chief Executive Officer of its Nautica division. She will assume the position held since August 2003 by Nautica founder, David Chu, who is leaving to pursue other interests.

Prior to joining VF Corporation, Ms. Seegal was CEO and President of Sweetface Fashion Company. During her career in the fashion industry she has served in a variety of executive positions at Liz Claiborne Inc., Calvin Klein Inc., Donna Karan International and Ralph Lauren Womenswear. Ms. Seegal will report to Eric Wiseman, Vice President and Chairman of VF's Outdoor and Sportswear Coalitions. She is expected to join the company in mid-October.

"I am delighted to welcome Denise to VF and to Nautica," said Mr. Wiseman. "This is a very exciting time at Nautica as we move forward with our growth plans, and Denise has the strategic vision, brand building expertise and marketing savvy that will take the Nautica brand to the next level. Denise is a high caliber leader with the energy, experience and passion to fill this very important role within our company."

Ms. Seegal has been CEO and President of Sweetface Fashions for its JLO business since June 2002. Since taking over the management of the JLO brand, Denise has increased the brand presence at retail through a focused approach to the merchandising and distribution, and through the negotiation of significant licensing agreements in beauty, lingerie and accessories. From 1996 to 2000 she served as President of Liz Claiborne Inc., a $4 billion publicly held supplier of branded women's and men's apparel, accessories and cosmetics. Previously, she served for two years as president of the CK Men's and CK Women's division of Calvin Klein Inc. In 1988, she became the founding President of DKNY (Donna Karan New York), where she remained until 1994. From 1983 to 1988 she was Executive Vice President of Ralph Lauren Womenswear. Her retail experience includes seven years at Bloomingdales where she began her career and was promoted to a Group Merchandising Manager of Designer Sportswear.

"I look forward to working with Eric Wiseman and the talented Nautica executive team as we continue to build this powerful global brand. I will be proud to be part of VF Corporation and its future strategic growth initiatives," Ms. Seegal said.

Mr. Wiseman added, "We are pleased with the progress of the Nautica business over the last year, and we appreciate the contribution David Chu has made to this effort. His unique perspective on the history of the brand has helped the Nautica team craft an exciting vision for our future."

**About the Company**

VF Corporation is a leader in branded apparel including jeanswear, intimate apparel, sportswear, outdoor products and workwear. Its principal brands include *Lee*®, *Wrangler*®, *Riders*®, *Rustler*®, *Vanity Fair*®, *Vassarette*®, *Bestform*®, *Lily of France*®, *Nautica*®, *Earl Jean*®, *John Varvatos*®, *JanSport*®, *Eastpak*®, *The North Face*®, *Vans*®, *Napapijri*®, *Kipling*®, *Lee Sport*®and *Red Kap*®.

VF Corporation's press releases, annual report and other information can be accessed through the Company's home page, www.vfc.com.

E

# WAI G. ENG, CPA, P.C.
## Certified Public Accountants

800 Second Avenue, 8th Floor
New York, NY 10017
Tel.: (212) 692-9888
Fax.: (212) 692-9191

September 14, 2004

BY HAND

Ms. Dinorah Fiallo
Nautica Enterprises Inc.
40 West 57th Street, 3rd Floor
New York, NY 10019

Dear Ms. Fiallo:

On behalf of David Chu, we have enclosed his check (Number 862) in the amount of $7,810.86 payable to Nautica.

We believe that the direct payroll deposit in the amount of $7,810.86 that was made into David's bank account on September 9, 2004 may have been in error. The earning statement (copy enclosed) for such payroll deposit for the period ending September 04, 2004 appears to be paying David beyond the August 27, 2004 termination date.

Therefore, please check your records, recalculate the compensation owed by Nautica to David and discuss with us before making any further direct deposit into his account.

We appreciate all your help and cooperation in this matter. If you have any questions, please do not hesitate to call me at (212) 692-9888.

Very truly yours,

Wai G. Eng, CPA

Enclosures

F

Monday November 8, 2004

David Chu to Launch Collection

NEW YORK — David Chu is back in the game.

The founder and former chief executive officer of VF Corp.'s Nautica business has established a new company to market an upscale men's designer collection label, to debut at retail in fall '05. Chu decided less than two months ago to jump-start this latest venture, and the label does not yet have an official name — but the collection will be shown to retailers in January, most likely at The Collective trade show.

Chu said the new collection will encompass a range of sporty, sophisticated pieces with a distinctly American point of view, such as colorful corduroy trousers, quilted blazers, shearling-lined duffel coats and striped cashmere turtleneck pullovers.

Retail prices have not been finalized, but Chu estimated they would be about $120 for woven shirts, tailored sport coats from $700 to $1,000 and outerwear up to $3,000. Chu plans to target better specialty stores, such as Barneys New York, Neiman Marcus and Mitchells/Richards. In accordance with the luxe appeal of the label, the line is being produced in Italy from Italian fabrics and materials.

The new company is named DC Design International and Chu has so far hired seven employees, including vice-president of merchandising Jean Boland, who held a similar position at Joseph Abboud until last June. Anne Taylor Davis, who has worked with Chu for almost 20 years, is overseeing public relations for the company.

DC Design International is owned and financed by the designer personally.
Chu reaped a windfall of at least $104 million when VF Corp. acquired Nautica last year — although that sum is being paid over the course of four years. Asked if he has a non-compete agreement with VF Corp. that could affect his new initiative, Chu said it wasn't exactly clear what his contract stipulated in that area. However, he pointed out that his new label is not in direct competition with Nautica, given the divergent price points, so any non-compete clause is moot. "This is about luxury," he noted of his new label, which will carry markedly higher prices than Nautica's offerings.

— David Lipke

G



November 10, 2004

**VF Corporation**
105 Corporate Center Blvd.
Greensboro, NC 27408-3194
voice 336.424.6000

Mr. David Chu
610 Park Avenue
New York, NY 10021

Dear David:

We would like to take this opportunity to remind you that, in connection with the sale of Nautica to VF Corporation, you are subject to a non-compete agreement with Nautica and VF Corporation. Specifically, Section 13 of the Employment and Consulting Agreement between you and Nautica and VF, dated as of July 23, 2003 (the "Agreement"), provides, subject to certain limited geographic and ownership exceptions, as follows:

> ....[You] i) during the period from the Effective Date through December 31, 2005 shall not, directly or indirectly, on [your] behalf or on behalf of any other person, firm, corporation, association or other entity, as an employee or otherwise, engage in, or in any way be concerned with or negotiate for, or acquire or maintain any ownership interest in any business or activity which is the same as or competitive with that conducted by [VF Corporation] or [Nautica] at the termination of [your] employment by the Company....

As you know, VF Corporation includes John Varvatos®, Nautica®, The North Face®, Napapijri® and many other brands, several of which are targeted at premium and luxury price points across many product categories. We expect you to honor your obligations not to compete with VF in any way as defined under the Agreement.

Regards,

Laura C. Meagher
Assistant General Counsel

cc: Mark Lane, Esq.